UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | CRIMINAL NO.: 07-276 (ESH) |
| v.     : | |
| : | FILED |
| PROCLAD INTERNATIONAL : | |
| PIPELINES, LIMITED, : | NOV 3 0 2007 |
| : | |
| Defendant.    : | NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT |

### FACTUAL PROFFER

Had this case gone to trial, the government would have proven beyond a reasonable doubt that:

1. **PROCLAD INTERNATIONAL PIPELINES, LIMITED ("PROCLAD")**, willfully attempted to export U.S. origin specialty alloy pipes to Iran without obtaining an export license from the United States Department of the Treasury or any other agency in the District of Columbia.

2. **PROCLAD** was a British corporation with its principal place of business in Staffordshire, England, and engaged in the business of supplying specialty alloy pipes, used *inter alia* in the oil and gas industry.

3. The parties agree that the relevant law is set forth accurately in the Information. To summarize, the Iranian Transactions Regulations, 31 C.F.R. Part 560, issued pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701, et seq., implemented Presidential Executive Orders imposing an embargo against Iran. The Iranian Transactions Regulations prohibit any exportation, reexportation, sale or supply directly or indirectly from the United States or by a

1

United States person, of any goods, technology or services to Iran without prior authorization from the United States Government. 31 C.F.R. § 560.204. They further prohibit the exportation, reexportation, sale or supply to a third country undertaken with knowledge or reason to know that the export is intended for Iran or for use in the production of, commingling with or for incorporation into goods, technology or services for Iran without prior authorization from the United States Government. Id. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, has responsibility for administering the Iranian Transactions Regulations, and is the entity empowered to authorize transactions with Iran during the embargo. Such authorization, if granted, would be in the form of a license.

4. The Export Administration Regulations, 15 C.F.R. Part 746, promulgated pursuant to the Export Administration Act, 50 U.S.C. App. § 2401, et seq., and kept in force under the International Emergency Economic Powers Act, prohibit exports subject to the Iranian Transactions Regulations without prior authorization from the U.S. Government. 15 C.F.R. § 746.7. Moreover, the Export Administration Regulations set forth certain other violations of the export controls, including aiding and abetting, conspiracy, evasion, acting with knowledge of a violation, attempt, and false statements, 15 C.F.R. §§ 764.2(a)-(h).

## Attempted Illegal Export

5. Sometime in early 2004, **PROCLAD** requested a bid from PA, Inc., a U.S. company based in Houston, Texas, for the sale of specialty alloy pipes. On or about January 30, 2004, PA, Inc., prepared a bid for the sale of the pipes to **PROCLAD**. On or about February 2, 2004, **PROCLAD** accepted the bid of PA, Inc., and sent PA, Inc., a purchase order for $147,487.28 worth

of specialty alloy pipes. Because PA, Inc., did not have the total amount of the ordered pipes in stock, the parties agreed that PA, Inc., would ship the pipes as they became available. The first shipment was for $33,653.13 worth of the specialty alloy pipes.

6. On or about February 2, 2004, **PROCLAD Employee A** sent an email to PA, Inc., which included shipping paperwork (also known as "shipping marks") to be included on the shipment. The shipping marks indicated the description of the goods to be shipped and had blank spaces to be filled in regarding the weights and dimensions of the shipment. The shipping marks also indicated that the pipes were intended for a gas field development project in Iran. Within a diamond shaped box, the shipping marks indicated the Iranian destination of the shipment as follows:

> I.R. IRAN
> NIOC – PARS OIL & GAS
> ENI IRAN B.V. SOUTH PARS
> PHASE 4 & 5
> OFFSHORE FACILITIES
> FIELD DEVELOPMENT PROJECT
> HYUNDAI ENG & CONTR CO LTD.

PA, Inc., filled in the blank spaces regarding the weights and dimensions of the shipment and placed these shipping marks on the crates that PA, Inc., used to pack the pipes for shipment.

7. On or about February 10, 2004, PA, Inc., delivered the crates containing the specialty alloy pipes, along with the shipping marks that indicated the Iranian destination of the shipment, to NNR Cargo, a freightforwarder designated by **PROCLAD** to process the export.

8. On or about February 11, 2004, NNR Cargo's air freight manager reviewed the shipping documentation, including the shipping marks which indicated the Iranian destination, and

3

contacted PA, Inc. NNR Cargo's air freight manager advised PA, Inc., that, because of the U.S. embargo against Iran, it could not ship merchandise to Iran in the absence of a license. NNR Cargo's air freight manager indicated that the Iranian embargo covered direct or indirect shipments to Iran. NNR Cargo's air freight manager indicated that NNR Cargo would return the shipment to PA, Inc.

9. On or about February 11, 2004, NNR Cargo sent an email to **PROCLAD Employee B**, advising that there was a problem with the shipment because "the USA government [has] trade Sanctions for all exports to Iran Directly or Indirectly." NNR Cargo attached to this email an electronic file containing the Department of the Treasury's four-page bulletin on the embargo against Iran (dated March 12, 2003). The bulletin was entitled: "What You Need To Know About U.S. Economic Sanctions: An overview of O.F.A.C. Regulations involving Sanctions against Iran." **PROCLAD Employee B** replied by email that "the only way we can get around this is to ship back to the UK & airfreight out to Dubai? What if we take off the shipping docs the clause 'transit cargo to Iran via Dubai' – could we then send direct?"

10. On or about February 12, 2004, **PROCLAD Employee A** sent an email to PA, Inc., which included new shipping documents. The shipping documentation included the identical shipping marks, except that the references to Iran were deleted. Within a diamond shaped box, the shipping marks indicated the ultimate destination of the shipment as follows:

> PHASE 4 & 5
> OFFSHORE FACILITIES
> FIELD DEVELOPMENT PROJECT
> HYUNDAI ENG & CONTR CO LTD.

11. On or about February 16, 2004, the shipment was returned from NNR Cargo to PA,

Inc. On or about February 17, 2004, PA, Inc., delivered the crates containing the specialty alloy pipes, along with shipping documentation, to DFDS Transport, another freightforwarder designated by **PROCLAD** to process the export.

12. On or about February 18, 2004, agents with the Department of Commerce detained the shipment at DFDS Transport, thereby preventing its export.

13. Sometime in early 2004, **PROCLAD** requested a bid from a U.S. company based in Hampton, Georgia (hereinafter referred to as the "Georgia Company"), for the sale of specialty alloy pipes. On or about February 2, 2004, **PROCLAD** accepted the bid of the Georgia Company, and sent the Georgia Company a purchase order for $139,003.61 worth of specialty alloy pipes. **PROCLAD** included with the purchase order the shipping paperwork to be included on the shipment. The shipping marks were identical to the shipping marks described in paragraph 6.

14. On or about February 12, 2004, **PROCLAD Employee A** sent a fax to the Georgia Company, which included new shipping documents. The new shipping documents included shipping marks, which made no reference to Iran.

15. On or about February 20, 2004, agents with the Department of Commerce detained the shipment, thereby preventing its export.

16. No licenses were applied for or obtained from the United States Department of

Treasury or any other agency in the District of Columbia, for any of the dealings with Iran by **PROCLAD**.

                                            JEFFREY A. TAYLOR
                                            United States Attorney
                                            for the District of Columbia
                                            D.C. Bar No. 498610

By:                     _____
                                            Jonathan M. Malis
                                            D.C. Bar No. 454548
                                            Assistant United States Attorney
                                            555 4th Street, N.W.
                                            Washington, D.C. 20530
                                            (202) 305-9665
                                            Jonathan.M.Malis@usdoj.gov

Dated: October 16, 2007

Defendant's Stipulation and Signature

I am a Director of Proclad International Pipelines, Limited. I am authorized by Proclad International Pipelines, Limited, to act on its behalf in this matter.

On behalf of Proclad International Pipelines, Limited, after consulting with its attorneys and pursuant to the plea agreement entered into this day with the United States, I hereby stipulate that the above statement of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Proclad International Pipelines, Limited

3 October 2007
Date

By: Alan Rodger
Director, Proclad International Pipelines, Limited

Attorney's Acknowledgment

I am counsel for Proclad International Pipelines, Limited. I have carefully reviewed the above statement of facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

October 15, 2007
Date

Zachary J. Harmon, Esq.
Counsel for Proclad International Pipelines, Limited