UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO.: 07-276-01(ESH) |
| | : | |
| v. | : | Sentencing: March 14, 2008 |
| | : | |
| PROCLAD INTERNATIONAL PIPELINES, LIMITED, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM IN SUPPORT OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of sentencing in this matter. The Court has accepted the defendant's guilty plea, which was entered pursuant to the parties' written plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). At sentencing, the Court should therefore sentence defendant Proclad International Pipelines, Limited, consistent with the terms of that plea agreement, to a criminal fine of $100,000 and corporate probation of five years.

## PROCEDURAL BACKGROUND

1. On November 30, 2007, pursuant to a written plea agreement with the United States, the defendant, through its organizational representative Alan Rodger, pled guilty to one felony count of a criminal Information, charging Proclad International Pipelines, Limited, with Attempted Export without a License, in violation of 50 U.S.C. §§ 1701-1706; 31 CFR Part 560; and 15 CFR Parts 746 and 764.

2. Pursuant to the plea agreement, the defendant, through Mr. Rodger, admitted its guilt to the offense conduct described in the factual proffer attached to that agreement.

3. The plea colloquy was conducted by United States Magistrate Judge Alan Kay, on the Court's referral and with the consent of the parties. Magistrate Judge Kay subsequently issued a Report and Recommendation, advising the Court to accept the defendant's guilty plea.

4. By written order, dated December 27, 2007, the Court adopted Magistrate Kay's recommendation and accepted the defendant's guilty plea.

5. Pursuant to Rule 11(c)(1)(C), the plea agreement provides for an agreed-upon sentence of a criminal fine of $100,000, and corporate probation of five years. The plea agreement provides that the defendant must pay the criminal fine at the time of sentencing.

6. The plea agreement provides for a five-year term of corporate probation. In addition to the general conditions of probation, the plea agreement provides for the following specific additional conditions of probation: (1) the defendant shall pay the sum set forth in the agreement; and (2) pursuant to 18 U.S.C. § 3563(a)(1), the defendant shall not commit any federal, state or local crimes during the term of probation.

7. The plea agreement also refers to the civil fine and other civil sanctions to be imposed on the defendant for the conduct that gave rise to the criminal charge. Attached to the plea agreement filed with the Court is a separate agreement between the defendant and the United States Department of Commerce regarding disposition of certain civil claims against the defendant. The two most significant terms of that separate agreement are: (1) the defendant's agreement to pay an administrative fine of $100,000; and (2) the defendant's agreement to the entry of a seven-year order denying the defendant export privileges, which order was immediately suspended.

**STIPULATED OFFENSE CONDUCT**

8. **PROCLAD INTERNATIONAL PIPELINES, LIMITED ("PROCLAD"),** willfully attempted to export U.S. origin specialty alloy pipes to Iran without obtaining an export license from the United States Department of the Treasury or any other agency in the District of Columbia.

9. **PROCLAD** was a British corporation with its principal place of business in Staffordshire, England, and engaged in the business of supplying specialty alloy pipes, used *inter alia* in the oil and gas industry.

10. Sometime in early 2004, **PROCLAD** requested a bid from PA, Inc., a U.S. company based in Houston, Texas, for the sale of specialty alloy pipes. On or about January 30, 2004, PA, Inc., prepared a bid for the sale of the pipes to **PROCLAD**. On or about February 2, 2004, **PROCLAD** accepted the bid of PA, Inc., and sent PA, Inc., a purchase order for $147,487.28 worth of specialty alloy pipes. Because PA, Inc., did not have the total amount of the ordered pipes in stock, the parties agreed that PA, Inc., would ship the pipes as they became available. The first shipment was for $33,653.13 worth of the specialty alloy pipes.

11. On or about February 2, 2004, **PROCLAD Employee A** sent an email to PA, Inc., which included shipping paperwork (also known as "shipping marks") to be included on the shipment. The shipping marks indicated the description of the goods to be shipped and had blank spaces to be filled in regarding the weights and dimensions of the shipment. The shipping marks also indicated that the pipes were intended for a gas field development project in Iran. Within a diamond shaped box, the shipping marks indicated the Iranian destination of the shipment as follows:

       I.R. IRAN
       NIOC – PARS OIL & GAS
       ENI IRAN B.V. SOUTH PARS
       PHASE 4 & 5
       OFFSHORE FACILITIES
       FIELD DEVELOPMENT PROJECT
       HYUNDAI ENG & CONTR CO LTD.

PA, Inc., filled in the blank spaces regarding the weights and dimensions of the shipment and placed these shipping marks on the crates that PA, Inc., used to pack the pipes for shipment.

    12. On or about February 10, 2004, PA, Inc., delivered the crates containing the specialty alloy pipes, along with the shipping marks that indicated the Iranian destination of the shipment, to NNR Cargo, a freightforwarder designated by **PROCLAD** to process the export.

    13. On or about February 11, 2004, NNR Cargo's air freight manager reviewed the shipping documentation, including the shipping marks which indicated the Iranian destination, and contacted PA, Inc. NNR Cargo's air freight manager advised PA, Inc., that, because of the U.S. embargo against Iran, it could not ship merchandise to Iran in the absence of a license. NNR Cargo's air freight manager indicated that the Iranian embargo covered direct or indirect shipments to Iran. NNR Cargo's air freight manager indicated that NNR Cargo would return the shipment to PA, Inc.

    14. On or about February 11, 2004, NNR Cargo sent an email to **PROCLAD Employee B**, advising that there was a problem with the shipment because "the USA government [has] trade Sanctions for all exports to Iran Directly or Indirectly." NNR Cargo attached to this email an electronic file containing the Department of the Treasury's four-page bulletin on the embargo against Iran (dated March 12, 2003). The bulletin was entitled: "What You Need To Know About U.S. Economic Sanctions: An overview of O.F.A.C. Regulations

involving Sanctions against Iran." **PROCLAD Employee B** replied by email that "the only way we can get around this is to ship back to the UK & airfreight out to Dubai? What if we take off the shipping docs the clause 'transit cargo to Iran via Dubai' – could we then send direct?"

15. On or about February 12, 2004, **PROCLAD Employee A** sent an email to PA, Inc., which included new shipping documents. The shipping documentation included the identical shipping marks, except that the references to Iran were deleted. Within a diamond shaped box, the shipping marks indicated the ultimate destination of the shipment as follows:

>PHASE 4 & 5
>OFFSHORE FACILITIES
>FIELD DEVELOPMENT PROJECT
>HYUNDAI ENG & CONTR CO LTD.

16. On or about February 16, 2004, the shipment was returned from NNR Cargo to PA, Inc. On or about February 17, 2004, PA, Inc., delivered the crates containing the specialty alloy pipes, along with shipping documentation, to DFDS Transport, another freightforwarder designated by **PROCLAD** to process the export.

17. On or about February 18, 2004, agents with the Department of Commerce detained the shipment at DFDS Transport, thereby preventing its export.

18. Sometime in early 2004, **PROCLAD** requested a bid from a U.S. company based in Hampton, Georgia (hereinafter referred to as the "Georgia Company"), for the sale of specialty alloy pipes. On or about February 2, 2004, **PROCLAD** accepted the bid of the Georgia Company, and sent the Georgia Company a purchase order for $139,003.61 worth of specialty alloy pipes. **PROCLAD** included with the purchase order the shipping paperwork to be included on the shipment. The shipping marks were identical to the shipping marks described in

paragraph 11.

19. On or about February 12, 2004, **PROCLAD Employee A** sent a fax to the Georgia Company, which included new shipping documents. The new shipping documents included shipping marks, which made no reference to Iran.

20. On or about February 20, 2004, agents with the Department of Commerce detained the shipment, thereby preventing its export.

21. No licenses were applied for or obtained from the United States Department of Treasury or any other agency in the District of Columbia, for any of the dealings with Iran by **PROCLAD**.

## CRIMINAL HISTORY

22. Consistent with the Pre-Sentence Report, the United States has no information that the defendant has engaged in similar misconduct or other misconduct.

## MAXIMUM STATUTORY PENALTIES AND SENTENCING GUIDELINES

23. For the defendant, as a corporate violator, the Attempted Export without a License count carries a maximum statutory fine of $500,000, pursuant to 18 U.S.C. § 3571(c)(3), a maximum term of corporate probation of 5 years, pursuant to 18 U.S.C. § 3561. The defendant is also required to pay a special assessment of $400 to the Clerk of the United States District Court.

24. As provided in the Pre-Sentence Report, the United States Sentencing Guidelines do not apply to this case, because the applicable guideline, USSG § 2M5.1(a), is not listed under USSG § 8C2.1, which governs fines for organizations. Therefore, pursuant to USSG § 8C2.10, the sentence is determined by applying 18 U.S.C. §§ 3553 and 3572.

**SENTENCING PURSUANT TO RULE 11(c)(1)(C)**

25.     Pursuant to Rule 11(c)(1)(C), the Court should sentence the defendant to the agreed-upon sentence of a criminal fine of $100,000 and five years of corporate probation, with the specific additional conditions of probations described above.

26.     The plea agreement is a fair resolution of this case.  The agreement gives the defendant the full benefit of its early acceptance of responsibility, by providing it with a lesser criminal fine than the Court might otherwise impose after a trial and conviction.  The agreement also benefits the United States, because it avoids the expense, time, and risk associated with trial by jury.

27.     The plea agreement is particularly appropriate in light of the overall resolution of this case.  Combined with the separate agreement with the United States Department of Commerce, the defendant is required: (1) to pay a total penalty of $200,000 (half criminal, half administrative); (2) to remain on criminal probation for five years; and (3) to remain on "administrative probation" for seven years, with the severe sanction of losing its export privileges as further incentive to ensure compliance with all export control law requirements.

WHEREFORE, the government respectfully requests that the Court sentence the defendant pursuant to Rule 11(c)(1)(C) to a criminal fine of $100,000 and five years of

probation, with the specific additional conditions of probation provided in the plea agreement.

                                      Respectfully submitted,

                                      JEFFREY A. TAYLOR
                                      United States Attorney
                                        for the District of Columbia
                                        D.C. Bar No. 498610

By:              /s/
                Jonathan M. Malis
                D.C. Bar No. 454548
                Assistant United States Attorney
                (202) 305-9665
                Jonathan.M.Malis@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was caused to be served via the Court's Electronic Case Filing system on counsel of record on this 6th day of March, 2008.

                                      /s/
                                    Jonathan M. Malis
                                    Assistant United States Attorney